## JAMES THOMPSON, RESPONDENT, *v.* FRANKLIN C. AVERY, APPELLANT.[1]

1. SALE OF LAND.—ACTION FOR PURCHASE PRICE.—APPROVAL OF TITLE BY THIRD PERSON.—WHEN CONCLUSIVE.—JUDGMENT LIEN IN FAVOR OF UNITED STATES FOR FINE IN CRIMINAL ACTION.— DURATION OF LIEN.—STATUTE OF LIMITATION.—Plaintiff sold defendant certain land, for which defendant executed a note secured by mortgage on the land for the balance of the purchase price, payable when "present encumbrance and defects in the title to the premises * * * are removed and the title made good and marketable. The title to be so approved by the Salt Lake Abstract, Title Guarantee & Trust Company." At the time of the execution and delivery of the note and mortgage, there existed upon the premises a certain other mortgage in favor of one B., a former owner of the land and plaintiff's grantor. There existed also at the time a judgment in favor of the United States against B. for a fine in a criminal action. On the 26th day of April, 1891, the judgment had been standing of record five years. 2 Comp. Laws 1888, § 3414, provides that a judgment shall only be a lien on the debtor's land for five years. Defendant being a non-resident, sent money to the Commercial National Bank of Salt Lake

---

[1] Rehearing denied April 27, 1895.

City sufficient to pay the note and interest, with instructions-
to have the abstract company pass upon the title, and also to
see that the former mortgage and judgment were released.
On the 16th of April, 1891, defendant, through the bank, paid
plaintiff $2,561, leaving $1,800 in the bank as security for the
payment of the mortgage of B. and the judgment. Both
plaintiff and B. satisfied their respective mortgages on the
margin of the mortgage record, considering that the money
left in bank was sufficient security for them, and plaintiff
canceled the note as being paid in full, and delivered it to
the bank with instructions that when the amount due B. was
paid and his own draft honored for the balance, that the note
be sent canceled to defendant. On the 27th day of April,
1891, no execution had been issued in favor of the United
States on the judgment against B. Plaintiff produced to the
bank the certificate required from the abstract company ap-
proving the title and pronouncing the same good and market-
able and demanded the balance due him on the note. The
bank had previously sent the note canceled to defendant.
*Held: First.* That the plaintiff was entitled to recover from
the defendant the balance due on the note. *Second.* That the
judgment recovered by the United States was a lien on the
land, but that the same was barred by the provisions of 2
Comp. Laws 1888, § 3414, providing that a judgment shall.
only be a lien on the debtor's land for five years. *Third.*
That an entry on the margin of a mortgage record acknowl-
edging payment of the debt and discharging the mortgage is
a mere receipt, explainable by parol evidence, and does not
bar the recovery of the unpaid balance of the debt. *Fourth.*
That the approval of the title by the abstract company, as
stipulated in the note, in the absence of fraud or mistake,
was conclusive.

2. WRIT OF ELEGIT.—JUDGMENT LIEN.—The common-law writ of
*elegit* is not in force in Utah, and in the absence of a stat-
utory provision, a judgment is not a lien on the debtor's land.
At common law a judgment recovered by a sovereign for a
penalty in a criminal proceeding created no lien on the judg-
ment debtor's land.

3. JUDGMENTS OF FEDERAL COURTS IN TERRITORIES OF THE UNITED
STATES.—The judgments of the federal courts are liens on the

·debtor's land only when judgments are liens by the laws of the territory..

(No. 551.   Decided March 16, 1895.   39 P. R. 829.)

APPEAL from the District Court of the Third Judicial District.   Hon. Samuel A. Merritt, *Judge.*

Action by James Thomson against Franklin C. Avery. From a judgment for plaintiff, defendant appeals. *Affirmed.*

*Messrs. Ritchie & Ritchie,* for appellant.

It is not disputed that the note was in no event due before April 27, 1891; that Avery produced, April 13, sufficient money to pay it and from that time was ready to pay it whenever Thompson cleared up the title to the property; that Thomson received, April 16, $2,561 of the money and delivered the note to the bank marked paid and released his mortgage, leaving in the bank $1,800. The only disputed matters of fact in the case are what agreement was made on that day, and what instructions Thomson gave the bank when he delivered the note.   If Thomson's story is true, he made the bank his agent to hold and deliver the note to him, and when the bank sent it to Avery stating it to be canceled, that it was an act of Thomson's agent and binds him, as by it the note was canceled, and if any wrong was done the plaintiff he must sue the bank and not Avery.   The verdict is contrary to law, because the release in the words "I hereby satisfy this mortgage of record and declare the indebtedness thereby secured fully paid," is a legal discharge of the note, and a complete bar to a suit upon it.   2 Daniel, Nego. Inst. 1287–8, 1290; 2 Comp. Laws Utah, § 2641; 4 Gilman, 536, 543; *Succession of Mrs. Foerster,* 43 La. Ann.

190; *U. S.* v. *Childs*, 12 Wall. 232, 243; *Baker* v. *Nactrieb*, 19 How. 126.   A receipt in full in absence of allegation and evidence that it was given in ignorance of its purport or under duress is an acquittance in bar.   *De Armand* v. *U. S.*, 151 U. S. 491; see, also, *Hager* v. *Thompson*, 1 Black, 80.·  The judgment of the *United States* v. *Bergen* was a lien on the land when the action was brought.   Rev. Stat. U. S. § 716; 10 Wheat. 23.   Such liens as means of enforcing satisfaction of judgments had existed since Edward First's time (13 Edw. I. ch. 18), by virtue of a writ of *elegit*.   *Mansingill* v. *Downs*, 7 How. 765, 766; *U. S.* v. *Morrison*, 4 Pet. 124; *Morsell* v. *First National Bank*, 91 U. S. 357; *Cooke* v. *Avery*, 147 U. S. 389.   The history of judgment liens on realty goes back to the year 1285, when by this statute of 13 Edward I, called the statute of Westminster 2d, the writ of *elegit* was created.   The writ of *elegit* only permitted half the debtor's lands to be taken and held by the creditor until the profits would pay the debt.   1 Black on Judg. § 397; *Cooke* v. *Avery, supra; Porter's Lessee* v. *Cocke*, Peck (Tenn.), 30; *U. S.* v. *Morrison, supra.*

In 1732, by the statute of George II, ch. 7, § 4, it was enacted for the first time that lands in the American colonies might be sold for debt.   *Porter* v. *Cocke, supra; U. S.* v. *Morrison, supra; Massingill* v. *Downs, supra; Tayloe* v. *Thompson*, 5 Pet. 369.   By the common law itself debts due the king were always liens on the lands of the debtor.   Magna Charta, ch. 8; Blackstone, *419, 420; 1 Black. Judg. § 397.   The powers of sovereignty passed to the states of the Union and to the federal government, being divided between them in their respective spheres.   *Dollar Savings Bank* v. *United States*, 19 Wall. 239, and cases there cited.   Statute Staple, 33 Henry VIII, c. 39, gave a larger lien than the statute creating the writ of *elegit*, because it covered all the debtor's lands

instead of half.    3 Blackstone, *420; 2 Blackstone, *160;.
Anderson Law Dic. 972.    Whatever powers were in these
various ways conferred upon and possessed by the English
courts to enforce the king's judgments, were conferred
upon the federal courts.    Rev. Stat. U. S. 716; 10 Wheat.
23, 24.    We call attention to the following principles:.
Time does not run against the sovereign.    1 Black. Com.
88; *U. S.* v. *Thompson,* 98 U. S. 486.    Its judgment is.
never barred.    *U. S.* v. *Thompson, supra; Stanley* v.
*Schwalby,* 147 U. S. 514; 13 A. & E. Ency. 712, and
many cases cited.    The lien is inseparable from the judg-
ment.    *Massingill* v. *Downs, supra.*    Its judgment needs
no *scire facias* nor other method of revivor to keep it.
alive.    The lien continues as long as the judgment does.
*Commonwealth* v. *Baldwin,* 1 Watts (Pa.), 54; 1 Salkeld,
603; *Nimms* v. *Com.,* 4 H. & M. (Va.) 70, 71*n.*    No
statute includes the sovereign unless it is expressly named.
*Dollar S. Bk.* v. *U. S., supra; Jossellyn* v. *State,* 28 Miss.
753, 762; *Swan* v. *Gaston,* 87 Ala. 569; *U. S.* v. *Herron,*
20 Wall. 257; *U. S.* v. *N., etc., Ry.,* 118 U. S. 125; *U.
S.* v. *Insley,* 130 U. S. 266.    When a right of the state
or sovereign power is involved in a case of doubt, all
doubts are resolved in favor of the state.    *Des Moines Co.,
Iowa* v. *Harker,* 34 Iowa, 84–86; *Trustees* v. *Auditor,* 80
Ky. 341; *Hardin* v. *Taylor,* 4 B. Mon. 523; *Stoughton* v.
*Baker,* 4 Mass. 522, 528; *State* v. *School Dist.,* 24 Kan.
237, 242.

*Mr. J. E. Darmer, Messrs. Loofbourow & Kahn,* for
respondent.

KING, J.:

The complaint in this case, which was filed March 7,.
1892, declares on a promissory note for $4,000, dated Feb-
ruary 27, 1890, due one year after date, with 8 per cent.

interest from date and attorney's fees, and which contains the following provision: "It is hereby expressly agreed and understood between the maker of this note and the payee, James Thompson, that this note is not payable, in any event, until present incumbrances and defects in the title to the premises, for which this note is given in part payment of purchase money, are removed, and the title made good and marketable, the title to be so approved by the Salt Lake Abstract, Title Guarantee & Trust Company, of Salt Lake City, Utah." The complaint describes the premises in controversy, and alleges that by April 27, 1891, all incumbrances had been removed, the title made good and marketable, and approved by the abstract company named; all conditions of the note had been performed, and it was fully due, and that plaintiff had intrusted the note to the Commercial National Bank of Salt Lake City, to be delivered to defendant only upon full payment, and that the bank wrongfully delivered it to the defendant without full payment; that $3,431 had been paid thereon. Judgment is prayed for in the sum of $1,001.64, with interest from March 7, 1892, and $200 attorney's fee. Defendant's answer admits the execution of the note, and that it was given in part payment of the premises described; denies that on April 27, 1891, all incumbrances and defects in the title had been removed, or that it was then good and marketable, or that the said abstract company had approved the title, or that the conditions of the note were fully performed, or that the note was then due, or that the bank wrongfully delivered the note to the defendant, or that any sum is due thereon; it alleges that plaintiff conveyed the premises to defendant by warranty deed; that among the incumbrances existing April 27, 1891, was a judgment lien for $1,200, interest and costs, by virtue of an unsatisfied judgment rendered and docketed April 26, 1886, in the Third District Court of Utah, in

favor of the United States and against John Bergen, then owner of the premises; that defendant deposited before April 16, 1891, in said bank, $4,361, to fully pay said note, when all its conditions were performed; that on April 16, 1891, in consideration of $2,561 of said money, then paid plaintiff, and of an agreement between him and defendant then made that said bank should retain $1,800 until the title was perfect, and made good and marketable, plaintiff canceled the note by writing across its face, "Received payment in full, April 16th. James Thompson,"— and authorized its delivery to defendant. The answer further alleges that the note has been paid in full, and disclaims ownership of the money held in the bank.

The case was tried April 17, 1894, before a jury. The plaintiff offered in evidence a certificate of the Salt Lake Abstract, Title Guarantee & Trust Company. The defendant admitted its exexcution by said company, and that $200 was a reasonable attorney's fee. Plaintiff then rested, and defendant moved for a nonsuit, which motion was denied. Testimony was then offered by the defendant, and in rebuttal the plaintiff testified at length. While there is some dispute in the testimony offered by the respective parties, it tends to establish the following facts:

That at the time said note was executed plaintiff was the owner of the premises mentioned, which were situate in Salt Lake City, and conveyed them to the defendant by deed of warranty, taking in part payment the note above referred to, together with a mortgage from the defendant upon the same premises to secure its payment. This property had formerly been owned by one John Bergen, and, while he so owned it, a judgment had been rendered against him, on the 26th day of April, 1886, in the Third District Court of Utah, based on four counts in one indictment charging him with the crime of unlawful cohabitation. The judgment was for $300 on each count and costs,

and had not been paid. Subsequently Bergen sold the property to plaintiff's grantor, taking a mortgage in part payment, which plaintiff had assumed. The latter was withholding payment on the Bergen mortgage to protect himself against the judgment which had been rendered against Bergen, until such time as it should be paid, or cease to be a lien on the property. The incumbrances referred to in defendant's note which were to be removed were the Bergen mortgage and the judgment against him. On the 13th of April, 1891, defendant sent to the Commercial National Bank of Salt Lake City $4,361, accompanied by a letter, of which the following is a copy: "Fort Collins, Colo., April 13th, 1891. John W. Donnellan, Cashier—Dear Sir: Inclosed please find Denver draft for $4,361, to pay my note of $4,000, and interest due February 27th, 1891. Please cancel and return my note. J. B. Blazer will attend to the matter, but I wish that you would have the abstract company pass upon the title, and see that the former mortgage and judgment are released. I understand by the inclosed telegram that it will be clear. Any charges for your trouble I will gladly pay. Very truly yours, F. C. Avery."

On the 16th of April, plaintiff, Bergen, and Blazer, who represented defendant, met at the Commercial National Bank, and made an arrangement by which $2,561 was paid to the plaintiff, leaving $1,800 of the money still remaining in the bank. The parties had been advised that, under the decision of the supreme court in the Snow Case, 120 U. S. 274, 7 Sup. Ct. 556, only one of the four separate judgments against Bergen was valid. Eight hundred and seventy-one dollars of the amount remaining in the bank was required to meet the Bergen mortgage, and the balance would be due the plaintiff. It was considered by the plaintiff and Bergen that the amount left in the bank was sufficient security, and they canceled their mortgages.

This left the title of the property clear, with exception of whatever lien the judgment against Bergen constituted. On the 26th of April the judgment would be five years old, and it was understood, plaintiff contended, that on that day the lien would be discharged and the property absolutely cleared. Plaintiff drew a check in favor of Bergen for $871, payable on the 27th, and arranged with the bank to draw a draft on it for the balance of $929, on the 27th. The plaintiff, living at Provo, and not expecting to return on the 27th, left the note with the bank, with instructions, when the Bergen check was paid and his draft was honored, to deliver it to the defendant, and thereupon wrote the cancellation on the note. No execution was issued on the judgment against Bergen, and on the 27th the bank paid his check. Acting under the instructions of the defendant, who resided in Colorado, the bank refused payment of plaintiff's draft, and withheld the $929. The bank transmitted, contrary to plaintiff's instructions, the note to the defendant. Subsequently plaintiff secured from the company mentioned the following certificate: "The undersigned, the Salt Lake Abstract, Title Guarantee & Trust Company, at the request of James Thompson and Franklin C. Avery, and in pursuance of an agreement between said parties, have this day examined the title to the following described real property, in Salt Lake City, Utah [here follows the description]; and have and hereby approve the said title, and pronounce the same good and marketable. October 1st, 1891. [Signed] Salt Lake Abstract, Title Guarantee & Trust Company. [Seal.] E. W. Genter, Secy. & Mngr.,"—and presented it to John W. Donnellan, cashier of said bank, as defendant's agent, and demanded payment of the balance of the money. Acting under defendant's instructions, payment was refused, and plaintiff brought this suit. Judgment was rendered for the plaintiff, and defendant appeals.

The only assignments of error upon which appellant relies are presented in his brief, and we will discuss them in the order therein contained.

Appellant claims that the court erred in overruling his motion for nonsuit. After submitting the motion for non-suit, defendant introduced evidence in support of his defense, and plaintiff followed with rebutting evidence. The motion was waived, and at the conclusion of the case the proof was of such character as to not only warrant, but demand, its submission to the jury. If the court erred in overruling defendant's motion, the error was waived.[1] *Railroad Co.* v. *Mares,* 123 U. S. 710, 8 Sup. Ct. 321; *Railroad Co.* v. *Hawthorn,* 144 U. S. 202, 12 Sup. Ct. 591; *Smith* v. *Compton,* 6 Cal. 24; *Perkins* v. *Thornbergh,* 10 Cal. 190; *Schlessinger* v. *Mallard,* 70 Cal. 334, 11 Pac. 728; *Barton* v. *Kane,* 17 Wis. 38.

It is contended: *First,* that the evidence is insufficient to justify the verdict, for the reason that the transaction of April 16, 1891, amounted to a discharge and cancellation of the note upon which this action is founded; *second,* that the verdict is contrary to law, because the plaintiff, upon the county record, on that day satisfied and discharged the mortgage, and declared the indebtedness thereby secured fully paid. These two assignments, being so closely connected, will be considered together. It is argued by appellant's counsel that in consideration of receiving $2,561 on the 16th of April, before it was due, a new agreement was made by plaintiff, and that he canceled and surrendered the note, and that whatever relief he is entitled to must grow out of such agreement. It was also argued that, even if plaintiff did prescribe that certain conditions must exist before the notes should be surrendered, his instructions constituted the bank his agent, and, if the note were delivered wrongfully, the liability must rest upon the agent. We are unable to

[1] It appears that counsel in this cause did not call the Court's attention to an act approved March 3, 1894, Sess. Laws 1894, Ch. 39, Sec. 2, which provides that the offering of evidence after an overruling of a motion for a non-suit, will not be deemed a waiver. This cause was tried April 17, 1894.—REP.]

agree with appellant's counsel upon these propositions. It is admitted that plaintiff has not been paid the amount for which suit is brought; and the proof clearly established that the money was still in the bank, where defendant had deposited it, and that payment had been withheld pursuant to his positive instructions. As a condition precedent to plaintiff's recovery, a certificate from the abstract company, that all incumbrances had been removed and the title made good and marketable, was required. In order to perfect the title, Bergen canceled of record his mortgage, on the 16th day of April, believing the $1,800 left in the bank sufficient security for the amount due him from plaintiff, and the latter discharged the defendant's mortgage given to secure the note sued upon. The record shows that, this being done, the premises were free from all liens, unless the judgment in favor of the United States against Bergen constituted one.

Plaintiff's testimony was to the effect that an arrangement had been made between Bergen, the bank, and Blazer, as defendant's agents, and himself, by which the mortgages were to be canceled, and the note left with the bank until the 27th of April, at which time, if the government had not taken execution against Bergen, the note was to be delivered to defendant, and the $1,800 paid to Bergen and plaintiff; and both plaintiff and Blazer testified that it was expressly agreed that, if the government sought to collect the Bergen judgment, plaintiff's draft should be paid, and Bergen's check held until the matter was settled. No new contractual relation was entered into. The relations of the parties were not changed. The defendant voluntarily paid a part of the note before maturity, and withheld such an amount as was deemed fully adequate for his protection against any defects which might be found to exist in the title. It is sufficient answer to appellant's contention that the bank became the plaintiff's agent, and

for the detention of the money he must look to it that in all the bank did, it was acting under defendant's directions.    The trial court presented these questions fairly to the jury, and the issues were found in favor of the plaintiff.    We think there was sufficient evidence to warrant the finding of the jury.    Certainly, the plaintiff will not be deprived of his right to recover upon the note because of the wrongful act of the bank.    And plaintiff does not lose his right to maintain an action upon said note because it is canceled and surrendered through fraud or mistake (*Banks* v. *Marshall*, 23 Cal. 223; 3 Rand. Com. Paper, § 1477); and the plaintiff was entitled to introduce parol evidence to explain the receipt of payment which he indorsed upon the note (Id. § 1477, note 6).    And we do not think the indorsement upon the county records precludes plaintiff from maintaining this action.    It appears that, upon the margin of the record, where the mortgage given to secure plaintiff's note was recorded, by means of a rubber stamp the recorder placed the following words: "Salt Lake City, Utah, April 16th, 1891.    I hereby satisfy and discharge this mortgage of record, and declare the indebtedness secured thereby fully paid."    This the plaintiff, in the presence of the recorder, signed.    Appellant argues that these words amounted to a discharge of the note, and a complete bar to suit upon it.    It is evident that the plaintiff went to the recorder's office only for the purpose of canceling the mortgage of record.    It is not claimed that the words, reciting that the indebtedness secured was fully paid, were in fact true.    No one has been deceived or misled by it, and no element of estoppel has been suggested, as a result of plaintiff's action, that would in any manner affect the rights of the defendant or any other person.    Undoubtedly it completed a release of the mortgage, and discharged plaintiff's lien upon

the premises. It was effectual for that purpose, but we do not think that it was of such a formal and solemn character as to place it beyond the power of contradiction by parol evidence. It was a mere receipt, so far as this point was concerned, and plaintiff was entitled to make his explanation of the manner in which it came into existence. It does not come within the class of cases which necessitate an independent suit in a court of equity to modify or set aside.

Appellant complains because the court refused to permit him to introduce evidence of the judgment against Bergen. Objection to this testimony was made for the reason that the note provided that the abstract company was to approve the title, and that, having done so, it was immaterial. Respondent contends that the effect of the certificate above set out was conclusive between the parties on the question of title; that the company having approved the title, and pronounced it good and marketable, the condition upon which payment had been predicated had been fulfilled, and plaintiff was entitled to the full amount of the note. Appellant insists that unless the title was good and free from all incumbrances, and marketable, in fact, the certificate would prove unavailing; and that he had a right, notwithstanding the certificate, to show, if he could, any defects in the title. In New York the point involved in this question came before the court, where the plaintiff brought suit to collect a final payment for work done under a building contract which provided that payments were to be made in installments as the work progressed, upon certificates of the architects, and the last installment was to be paid "when all work is completely finished and certified to that effect by the architects." On the trial before the referee, defendant offered to show that the plaintiff had not erected and completed the building according to contract, but the referee held that the cer-

tificate of the architects was conclusive upon this point, and rejected the evidence. The case was appealed, and the court said: "The plaintiff was bound, as a condition precedent to final payment by the defendant, to procure the certificate (if it was not impracticable to get it without their fault), and whenever they did get it the defendant was bound to pay, unless he could show that the certificate was obtained by fraud or mistake. There was no attempt to show that the certificate was not given in good faith, and it concludes the rights of all parties." *Wyckoff* v. *Meyers*, 44 N. Y. 143; *Stewart* v. *Keteltas*, 36 N. Y. 388.

In *U. S.* v. *Robeson*, 9 Pet. 319, the defendant undertook to recover on a counterclaim for certain services without producing the certificate of the officer named in the contract, by proving by other evidence that he had in fact performed the contract; but the court held this "other evidence" of performance incompetent, and that the only competent evidence of performance would be the certificate of the party agreed upon. Mr. Justice McLean, speaking for the court, says: "Where the parties in their contract fix a certain mode by which the amount to be paid shall be ascertained, as in the present case, the party that seeks an enforcement of the agreement must show that he has done everything on his part which can be done to carry it into effect. He cannot compel the payment of the amount claimed, unless he shall procure the kind of evidence required by the contract, or show that by time or accident he is unable to do so; and, as this was not done by the defendant in the district court, no evidence to prove service, other than the certificates, should have been admitted by the court below." The parties to this suit, at the outset, deliberately agreed to refer the question of title to the abstract company. They selected it as an arbiter between them, and its determination of the ques-

tion was to be final and conclusive. There was no contention that any fraud had been perpetrated or mistake made by the company. We believe that the position of the trial court was correct. When the plaintiff produced the certificate, in accordance with the terms of the agreement, he was entitled to the amount due upon the note; and it is wholly immaterial, under the issues raised by the answer, whether an unsatisfied judgment against Bergen appeared of record. But the defendant replies that the certificate was never exhibited to him. This is true, but the record shows that after the 27th of April, 1891, and before suit was brought, the certificate of the abstract company, above set forth, was procured, and, if not delivered, at least exhibited to Mr. Donnellan, the cashier of the bank, and the evidence shows that the bank and Mr. Donnellan were acting as agents of the defendant. No objection was made by him or by the defendant to the form of the certificate, or to the mode or time of its presentation. We think, in respect to the certificate and the manner of its presentation, there was a sufficient compliance with the terms of the note.

But, even if it be considered that the certificate was not conclusive upon the question of title, we are still of the opinion that it was not error in refusing to admit the evidence of the judgments against Bergen; and that brings us to the question, was the judgment of the United States against Bergen a lien on the land in question when this action was brought? Defendant's position is that this judgment, rendered in 1886, was such an incumbrance as to amount to a cloud upon, if not a serious defect in, the plaintiff's title. This question was argued very ably by counsel, and, because of its importance, we deem it proper to pass upon it, while it is fully before us, although our view of the proposition last discussed is decisive of this case. As a foundation for appellant's claim respecting

this proposition, it is asserted that a judgment lien exists in the United States without any act of Congress explicitly so providing, by virtue of an act of September 24, 1789, and that the writ of *elegit* created such a lien. At common law no judgment lien existed in favor of the judgment creditor. The nearest approach to a modern judgment lien was found in St. 13 Edw. I, called the "Statute of Westminster II.," which created the writ of *elegit*. The only remedy offered the judgment creditor under this was the sequestration of the profits of the land by writ of *levari facias*, or the possession of a moiety of the lands by writ of *elegit*, and in certain cases of the whole of it by extent. In all these cases the creditor held the land in trust until the debt was discharged by the receipt of rents and profits. 4 Kent Comm. 429; 3 Bl. Comm. 419. It might be observed in passing that this was occasioned by the feudal system of land tenure, under which the feudatory was restricted from alienating or in any manner incumbering the land, and which prevented the land being charged with, or being seized for, debts, because "by these means the connection between lord and tenant might be destroyed, alienation might be made and the services of the vassal be transferred to be performed by a stranger." *Hutcheson* v. *Grubbs*, 80 Va. 254. It will be observed that this statute did not create a judgment lien upon the lands of the debtor, but offered the creditor an opportunity to subject a portion of the rents and profits to the satisfaction of his debt. While the judgment lien, as it has been expanded and is found today, may be traced to the writ by *elegit*, it would not be accurate to say that they are the same, or that there is any great analogy existing. Indeed, the remedy which this writ offered was deemed so meager that, in the year 1732, St. 5 Geo. II, c. 7 was passed for the relief of British creditors in their dealing with the American colonies.

Lands, hereditaments, and real estate were for the first time made subject to sale under execution at the instance of the judgment creditor. 4 Kent, Comm. 429; Freem. Ex'ns, § 370.

During the early settlement of this country the writ of *elegit* was adopted in a few of the states. Prior to the Revolution no general statute existed in this country or England extending its operation, but by judicial construction a broader scope was given it than the statute expressly provided. The practice was not harmonious in the states, some courts construing the lien to attach after the sheriff delivered possession of the land to the creditor, while still others construed the lien to attach upon levy by the sheriff, or upon issue and delivery of the execution to the sheriff. *Massingill* v. *Downs*, 7 How. 765. In Virginia, at an early date, the statute of Westminster II. was substantially adopted, the courts holding " that a lien was acquired by judgment which extended to all of defendant's lands within the state, and which was superior to the claims of subsequent purchasers, though for a valuable consideration and without notice. The lien thus acquired was a legal lien, and remained so long as the capacity to sue out an *elegit* continued, whether the writ was sued out or not." *Hutcheson* v. *Grubbs, supra.* Some of the states adopted 5 Geo. II, c. 7, and by long usage so extended and employed it that it became a lien on all the lands of the judgment debtor from the time that judgment was rendered. *Tayloe* v. *Thompson's Lessee,* 5 Pet. 367. But the writ of *elegit* is unknown to American jurisprudence, except in a few states, and in these was obsolete many years before the organization of this territory. The act of George II was not an extension of the writ of *elegit,* but an abolition of it. Most of the states, both before and after its enactment, had passed express statutes providing that lands should be subject to

execution. In some statutes it was enacted that from the docketing of the judgment the lien should be created, while others enacted the lien was created by the rendition of judgment, and still others provided that real estate might be sold upon execution, but did not, nor do they to this day, provide for any lien of the judgment on lands. 4 Kent Comm. (13th ed.) 429–437. It has been said that the lien of judgments, as a lien upon real estate, was adopted from the English statute of 4 & 5 W. & M. c. 110, which requires a memorandum of the judgment to be entered in a book in alphabetical order, and a fresh memorandum to be made thereon after five years from the first entry. 4 Kent Comm. (11th ed.) 489, note A. And where it was not settled whether the writ of *elegit* was brought to this country, it was held that it was repealed by the statute of Geo. II. *Den* v. *Hill,* 1 Hayw. (N. C.) 72, 95; 4 Kent Comm. (11th ed.) 492, note C. The reason for the existence of the writ of *elegit* never existed in the United States, and the slight countenance given to it in the United States was discontinued shortly after the passage of the act of Geo. II, above referred to. Freem. Ex'ns, § 370; 4 Kent Comm. 429–437. So it must be conceded that a judgment lien, as we find it in the United States today, is supported only by statutory authority, and, in the absence of express legislation, judgments do not attach to real estate, in the modern sense of the term (*Walker* v. *Elledge,* 65 Ala. 51; *Carlisle* v. *Godwin,* 68 Ala. 137; *Mitchell* v. *Wood,* 47 Miss. 231); and, unless there is a statute expressly making a judgment a. lien on real estate, no such property will attach to it. It was held in Pennsylvania that an order for the payment of a wife's expenses and support *pendente lite* is not a judgment such as to create a lien on the husband's land, for the reason that there was no statutory authority for so regarding it. *Grove's Appeal,* 68 Pa. St. 143.

The view that judgment liens are creatures of statute seems to have been adopted almost universally in the United States, for the subject has largely been under the control of the legislature, and laws have been made requiring judgments to be docketed in each county where it is sought to bind real estate, and changes have been made in existing laws.     The right of judgment lien is not one of contract or agreement, or one which is vested in the plaintiff by reason of his judgment.    Whatever right exists flows from the legislative department.    It cannot be said that it is a right founded in any principle of natural justice, because, if it were, we might suppose all the laws on this subject would be similar in all countries, whereas we find them variant.    Further, if it were founded in natural justice, it would seem that the debt first contracted should be first paid, whereas we know that priority of judgment does not depend upon priority of the demand upon which it is founded.    We think the writ of *elegit* does not exist in this territory, nor did it ever, in behalf of any judgment creditor or of the United States. So we must look, if there be a judgment lien in favor of the government of the United States, to some other source for it.    No law has been called to our attention passed by Congress creating a judgment lien.    The fourteenth section of the act of September 24, 1789, c. 20, commonly known as the "Judiciary Act," provided that the courts of the United States should have power to "issue writs of *scire facias, habeas corpus* and all other writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions and agreeable to the principles and usages of law; ". and the act of September 24, 1789, c. 21, commonly known as the "Process Act," enacts "that until further provision shall be made, and except where by this act or other statutes of the United States it is otherwise provided

the forms of writs and executions, except their style and modes of process, and rates of fees, except fees of judges in the circuit and district courts, in suits at common law, shall be the same in each state respectively as are now used and allowed in the supreme courts of the same." This act was temporary, and expired by its own limitation at the end of the next session of Congress. The act of May 8, 1792, c. 34, provided that the "forms of writs, executions, and other process and modes of proceeding in suits at common law, should continue to be the same as authorized by the act of 1789, subject, however, to such limitations and additions as the said courts shall in their discretion deem expedient or to such regulations as the supreme court shall think proper from time to time by rule to prescribe to any circuit or district courts concerning the same."

Speaking of this legislation, in the case of *Bank* v. *Halstead*, 10 Wheat. 60, it is said: "The general policy of all laws on this subject is very apparent. It was intended to approach and conform to state process and proceedings as a general rule, but under such guards and checks as might be necessary to insure the due exercise of the powers of the courts of the United States. They have authority, therefore, from time to time, to alter the process in such manner as they may deem expedient, and likewise to make additions thereto, which necessarily implies the power to enlarge the effect of the operation of the process." But this discretionary power in the courts of the United States was restricted by the act of May 19, 1826, c. 68, which provided "that thereafter writs of execution and other final process issued on judgments rendered in any of the courts of the United States and proceedings thereon should be the same, except their style, in each state respectively as were then used in the courts of such state, provided, however, that it should be in the power of the courts if

they saw fit in their discretion by rule of court, so far to alter final process in said courts as to conform the same to any change which might be adopted by the legislatures of the respective states for the state courts." "It will be seen, from this provision, that it was thereafter prohibited to the courts of the United States either to adopt or recognize any form of execution, or give any effect to it, except such as was at the time of the passage of the act, or had subsequently become at the time of their adoption of the writ, authorized by the laws of the state. The same provision has ever since been continued in force, and is now embodied in section 916 of the Revised Statutes." *Fink* v. *O'Neil,* 106 U. S. 278, 1 Sup. Ct. 325. Section 916 is as follows: "The party recovering judgment in any common-law cause in any circuit or district court shall be entitled to similar remedies upon the same by execution or otherwise to reach the property of the judgment debtor as are now provided in like cases by the laws of the state in which such court is held or by any such laws hereafter enacted which may be adopted by the general rules of such circuit or district courts, and such state laws as may hereafter be enforced in such state in relation to judgment upon remedies as aforesaid by execution or otherwise."

Pursuant to these enactments of Congress, it has been unanimously held that whatever lien resulted from a judgment in a court of the United States came from the statute of the state in which the judgment was rendered. As is said in *Baker* v. *Morton,* 12 Wall. 158: "Judgments were not liens at common law, but Congress, in adopting the modes of process prevailing in the states at the time the judicial system of the United States was organized, made judgments recovered in the federal courts liens in all cases where they were so by the laws of the states; and a later act of Congress has provided that judgments shall cease to have that operation in the same

manner and at the same periods, in the respective federal
districts, as like processes do when sued for in state
courts." The act of Congress referred to is as follows:
" Judgments or decrees rendered in the circuit or district
courts within the state shall cease to be liens in the same
manner and at like periods as judgments and decrees of
the courts of such state cease, by law, to be liens thereon."
Rev. St. U. S. § 967. It must not be supposed, however,
that this indirect method of vesting such judgment with
the quality of a lien was in any sense a recognition of the
right within the state to regulate the operation of federal
judgments. Judgment liens in the federal courts owe
their existence solely to authority of the national govern-
ment. As remarked by the supreme court of Ohio: " That
judgment liens are the creations of positive law, without
which they cannot exist, and that they cannot survive the
law which gave them being, are principles too well settled
to be drawn in question. I suppose it equally clear that
they must be created by the government under whose
authority judgment is rendered. A state may determine
the effects of its own judgment, but cannot affect those
rendered by the courts of the United States; while the
same limitation is equally true of the legislation of the
general government, which has an equal right to provide
for the security and satisfaction of judgments rendered in
its courts, but neither has any power to limit the sover-
eign right in the other." *Corwin* v. *Benham,* 2 Ohio St.
36. " But, since the courts originally adopted the state
laws on the subject, the rules for determining the nature
and character of the judgments that would give a lien,
for ascertaining what species of estates were bound there-
by, and similar matters, had to be sought in the laws and
decisions of the particular state." *Perkins* v. *Coal Co.,* 77
Ala. 403; Black, Judgm. § 414. Accordingly it is held
in Pennsylvania that the verdict alone, without entry of

judgment in the federal court, gives no lien upon the land. *In re Morris' Estate,* 6 Phila. 134. So if, under the state law, the lien of the judgment entered by the court of the state attaches from the date of the final adjournment of the term, the same rule applies to the federal judgments in the state. *Jones* v. *Guthrie,* 23 Ill. 421. And it has been held in Mississippi that judgment liens of the federal courts are subject to the state statute of limitations, the same as liens of domestic judgments. *Abby* v. *Bank,* 34 Miss. 571, S. C. 69 Am. Dec. 401. And a more recent act of Congress, passed August 1, 1888, clearly evidences the design to give to judgments in the federal courts the same territorial extent in respect to liens as the various states have provided for domestic judgments.

This legislation upon the part of Congress conclusively shows that Congress has purposed to place the federal courts, in respect to the question of judgment liens, upon the same footing as the state courts. While the power of Congress must be conceded to provide for judgment liens in all the federal courts, the wise view has been adopted to conform as far as possible the practice and procedure of the federal courts to the practice and procedure of the state courts, so that the judgment creditor in the federal court in any state obtains the same right to subject the property of the debtor to the satisfaction of his debt as one whose judgment is obtained in a state court. The question then arises, does a different rule apply in territories from that which obtains in the states? The supreme court of the United States has held " That the practice and proceedings and forms and modes of proceeding of the territorial courts, as well as their respective jurisdictions, subject to a few express or implied conditions in the organic act itself, were intended to be left to the legislative action of the territorial assembly, and the regulations which might be adopted by the courts

themselves." *Hornbuckle* v. *Toombs,* 18 Wall. 654; *Hershfield* v. *Griffith,* Id. 657. Under the organic act of the territory of Utah, the territorial legislature may enact such laws, upon all rightful subjects of legislation, as are consistent with the constitution and the laws of Congress. It is not necessary to decide whether the creditor had a judgment lien in the territory before provision was made by the local legislature. No matter what right a judgment would give either to the government or any individual, prior to any territorial enactment in respect to judgment liens, it is clear that Congress delegated this question, in a large degree at least, to the territory; and, when the latter acted and made provision for judgment liens, all persons, as well as the government, must resort thereto to determine their rights. It is provided by section 3414 of the Compiled Laws of Utah, that "from the time that judgment is docketed it becomes a lien upon all the real property of the judgment debtor, not exempt from execution, in the district, owned by him at the rendition of the judgment or by him thereafter acquired during the existence of said lien in his own right. The lien shall continue for five years unless judgment be previously satisfied. * * * " This was the only law in force upon this question in the territory when the judgment against Bergen was obtained.

Appellant's counsel insist that the maxim, the sovereign is not bound by the act unless named by special and particular words, is to be applied to this case, and it is argued that the territorial statute above quoted cannot be invoked against the government. The principle embodied in this statement has no application to the case at bar. It is true this statute is territorial, and was enacted, no doubt, for the benefit of domestic judgment creditors; and it must be admitted that the government was not con-

templated as coming within its provision. No authority exists in the territorial legislature to provide for a lien for judgments obtained in the federal courts, but, as has been shown, Congress has adopted this legislation, and made it applicable to judgments obtained in the courts created by it. To determine, then, the character and extent of a lien afforded judgment creditors, including the government, reference must be had to the local statute. But counsel invoke the rule that "*nullum tempus occurrit regi,*" and argue that, even if the government's lien as a judgment creditor owes its existence to the territorial law, it attached with the restriction that the statutes of limitation would not run against the government's lien. The rule is, no doubt, that statutes of limitation do not run against the government without its express provision, but this principle does not reach this case. Such statutes are those that restrict the period within which the right, otherwise unlimited, might be asserted. And. Law Dict. 26–29. The government by its legislation has stepped into the territorial forum, and, in order to have the benefit of judgment liens, has placed itself upon the same footing as domestic judgment creditors. No reasonable construction of the act of Congress above referred to permits the United States to avail itself of just enough of our statute to give it the benefit of the lien, and warrant it in repudiating that portion providing for its extinguishment. Our statute does not restrict the lien, which otherwise would be unlimited, but it creates a judgment lien which otherwise would not exist. Judgments and judgment liens are different things. The judgment against Bergen, in favor of the United States, may not be barred by the statute of limitations, but we think the judgment lien was extinguished at the expiration of the five years from the rendition of judgment. Counsel's position, that a lien is

inseparable from a judgment, we think unsound, and it is not supported by the cases cited.

The case of *Fink* v. *O'Neil, supra,* fairly meets the numerous objections urged by appellant to the application of the local law to the government. The question there was whether the provision in the practice act of Wisconsin, exempting certain property from execution, applied to judgments in favor of the United States. The court say: "This conclusion, that the provision of the practice act applies to judgments in favor of the United States, cannot be avoided by the consideration which is above urged upon us, that the process acts do not limit the sovereign rights of the United States, upon the principle that the sovereign is not bound by such law, unless it is expressly named. These laws are the expression of the sovereign will on the subject, and are conclusive upon judicial and executive officers to whom they are addressed, and as they forbid the issuance of an execution in any case, except subject to the limitations which they mention, and as there is no authority to issue an execution in any case whatever, except as conferred by them, the sovereign right invoked is left without a means of vindication. The United States cannot enforce the collection of a debt from an unwilling debtor, except by judicial process. They must bring suit and obtain judgment. To reap the fruits of that judgment, they must have execution issue. The courts have no inherent authority to take any one of these steps, except as it may have been conferred by the legislative department, for they can exercise no jurisdiction except as law confers and limits it." See, also *U. S.* v. *Railroad Co.,* 105 U. S. 263. Counsel also contended, as a "stronger reason than any heretofore suggested," that the United States has a judgment lien because judgment was obtained in the exercise of sovereign power, and is a

debt due the sovereign as such. At common law the sov-
ereign had no judgment lien, but all obligations made to
the king were liens on the lands of the debtor. This pre-
rogative was a consequence of the feudal system, and Mag.
Char. c. 8 provides that the debtor's land shall be taken
for the debts due the king, and was extended and defined
by 33 Hen. VIII, c. 39, which enacted "that all obliga-
tions made to the king shall have the same force as the
statute staple." This prerogative has never been asserted
by our government. So far as we are advised, the United
States never claimed any lien or priority for debts, except
such as were expressly provided for by legislation. See
*Keatson* v. *Bank*, 12 Pet. 102; *Thelusson* v. *Smith*, 2
Wheat. 396.

But, admitting counsel's position to be true, this pre-
rogative of the sovereign is not sufficiently comprehensive to
affect the case at bar. Fines in criminal cases never were
protected by liens on lands at common law. They were
neither included in the term "debt," used in Magna
Charta, nor in the term "obligation made to the king,"
used in the statute of Henry VIII, above mentioned. 2
Bl. Comm. 464, 465, 379. Section 1041 of the Revised
Statutes of the United States provides that fines or penal-
ties in criminal cases may be enforced in a like manner
as judgments in civil cases. It is clear that in criminal
cases judgments and fines in favor of the United States
are to be enforced in the manner provided by the local
or domestic statute; and it is provided in section 3414 of
the Compiled Laws of Utah that a judgment that the
defendant pay a fine constitutes a lien in a like manner as
judgment for money rendered in a civil action. The con-
clusion seems irresistible, that, unless section 3414 of the
Compiled Laws above mentioned is applicable to the
United States, it has no lien whatever in this territory by

virtue of any judgment which it may recover. We see no error in the record. The judgment of the lower court is affirmed.

BARTCH and SMITH, JJ., concur.